UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

SHARINA TORRES,                        :
                    Plaintiff,          :
                                        :
        v.                              :        No. 5:21-cv-04953
                                        :
UNITED STATES OF AMERICA,               :
                    Defendant.          :

_____

**O P I N I O N**
**(Non-Jury Trial – Verdict for Plaintiff)**

**Joseph F. Leeson, Jr.**                          **March 6, 2023**
**United States District Judge**


## I.        INTRODUCTION

This is a Federal Tort Claims Act ("FTCA") case against the United States following a

motor vehicle collision between Plaintiff Sharina Torres and the driver of a United States Postal

Service caravan.  Ms. Torres alleges that she was injured by the negligence of the United States.

The case was tried non-jury from August 8, 2022, through August 10, 2022, inclusive.  Pursuant

to Federal Rule of Civil Procedure 52(a), this Opinion sets forth the Court's findings of fact and

conclusions of law.  For the reasons set forth below, judgment in the amount of $11,840.07 is

entered in favor of Ms. Torres and against the United States.

## II.       FINDINGS OF FACT

After careful review of the testimony and evidence presented at trial, as well as the

submissions of counsel,[1] this Court makes the following findings of fact:

---

[1]        The parties separately filed Proposed Findings of Fact and Conclusions of Law.  *See* ECF
Nos. 50, 55.

## A.      Parties and Procedural Background

1.      The Plaintiff Sharina Torres is thirty-five years old.

2.      The Defendant is the United States of America.

3.      This case arises out of a motor vehicle collision that occurred on May 31, 2019.

4.      On or about April 1, 2021, Ms. Torres timely filed an administrative claim with the United States Postal Service ("USPS") Tort Center related to the collision.

5.      The claim requested damages of $500,000 for personal injuries and $500 for property damage.

6.      On November 10, 2021, having received no decision on her administrative claim, Ms. Torres filed a complaint in the instant action pursuant to the FTCA, 28 U.S.C. §§ 1346, 2671-2680.

7.      Because Ms. Torres had filed a civil complaint in the above-captioned action, the USPS denied her administrative claim on December 17, 2021.

8.      After filing the instant action, Ms. Torres increased her monetary demand to more than $5,000,000.

9.      Ms. Torres's attempt to increase her administrative claim was not a timely or effective amendment.

10.      On June 13, 2022, this Court granted the United States' Motion to Limit Plaintiff's Damages to $500,500.[2]

## B.      Motor Vehicle Collision on May 31, 2019

11.      On the afternoon of May 31, 2019, Ms. Torres was driving home from work during her lunch break to conduct a telephone job interview.

12.      As Ms. Torres was driving straight on Sumner Avenue in Allentown, Pennsylvania, she observed, from a distance, a postal van in front of her turn into an autobody shop parking lot and come to a stop.

13.      After coming to a stop, the postal van pulled back out onto Sumner Avenue, attempting a U-turn.

14.      Ms. Torres swerved into the left lane to try to avoid a collision, but the postal van hit Ms. Torres's vehicle on the passenger side.

---

[2]      The Opinion and Order dated June 13, 2022, are specially incorporated herein.  *See* ECF Nos. 24-25.

15.     Both vehicles were traveling at low speeds.

16.     Neither vehicles' airbags deployed in the collision.

17.     Ms. Torres was wearing a seatbelt.

18.     Ms. Torres was driving a Toyota Corolla.

19.     Ms. Torres was covered by a limited tort policy of automobile insurance with Erie Insurance.[3]

20.     The postal van was a ½ ton 2015 RAM Tradesman, with a gross weight of 6,050 pounds.

21.     The postal van was owned by the United States Postal Service.

22.     Ellen Choi was driving the postal van.

23.     Ms. Choi was a City Carrier Assistant and operated the postal van for the purpose of delivering mail within the scope of her employment with the United States Postal Service.

24.     The parties stipulate that Ms. Choi owed a duty of care to Ms. Torres and breached that duty.

25.     Ms. Torres exited her vehicle without any assistance after the collision.

26.     Ms. Torres did not lose consciousness on the day of the collision.

27.     Ms. Torres did not hit her head against anything in the collision.

28.     Ms. Torres's head was not bleeding.

29.     Ms. Torres's head and neck were rocked during the collision.

30.     A police officer arrived at the scene of the collision with a body camera at approximately 12:46 p.m.[4]

31.     At that time and times thereafter, Ms. Torres is seen on the body camera footage walking around without assistance or any balance problems.

32.     When the officer arrived, Ms. Torres was talking on her cellphone to the potential employer with whom she had an interview.

33.     Ms. Torres also called her mother and sister from the scene of the collision.

---

[3]     The Order issued this date granting in part Defendant's Motion to Supplement the Factual Record and the analysis contained therein are specifically incorporated into this Opinion.

[4]     The body camera video was played at trial.

34.     At various times throughout the footage, Ms. Torres is seen talking on her cellphone and coherently communicating with numerous persons, including the responding police officer.

35.     Ms. Torres is seen holding her cellphone in her right hand, moving and gesturing with both arms/hands, stretching out her right arm to shake hands, and holding her purse and a full water bottle with her right arm/hand.

36.     Ms. Torres did not believe her vehicle was drivable after the collision and did not feel well enough to drive it.

37.     The police officer that had arrived on scene was able to drive Ms. Torres's vehicle off the road before the tow truck driver arrived.

38.     Ms. Torres's car was towed from the area of the collision.

39.     In response to the police officer's initial question as to whether she was hurt, Ms. Torres stated that she felt "okay right now."

40.     A short time later, Ms. Torres informed the officer that she was starting to have pain in her neck and right arm/shoulder.

41.     The officer responded that he would note in his report that she had neck pain.

42.     Ms. Torres told the officer: "I don't know how all this works. It's new to me. I've never been in an accident."

43.     Ms. Torres stated that her sister was coming to pick her up and she would go to the hospital when they were finished.

44.     Thereafter, Ms. Torres accepted the officer's subsequent offer to call an ambulance.

45.     In radioing for an ambulance, the officer stated that it was for a thirty-two year-old female complaining of neck pain.

46.     After the ambulance's arrival, Ms. Torres showed no urgency in leaving for the hospital.

47.     Ms. Torres collected her belongings and asked the officer for her keys.

48.     The officer informed Ms. Torres that he had already returned her keys, which were in her pocket.

49.     The officer told Ms. Torres that he would meet her at the hospital to provide a copy of the insurance papers pertaining to the other vehicle.

50.     Before leaving in the ambulance, Ms. Torres also wanted to, and did, speak with a supervisor of Ms. Choi's.

51.     Ms. Torres informed the supervisor that she was in pain and inquired of the supervisor about, *inter alia*, a rental car.

52.     Ambulance records state that Ms. Torres complained of ride-sided neck pain that radiated into her right shoulder blade and arm.

53.     Although Ms. Torres showed some uncertainty in handling the aftermath of an accident, such as collecting her belongings, exchanging keys, and gathering insurance/accident documents, she did not appear to be dazed or confused in the footage.

### C.     Ms. Torres's School History Before and After the Collision

54.     From 2017 to 2018, Ms. Torres attended Lehigh Carbon Community College ("LCCC").

55.     Ms. Torres received an Associate in Arts degree from LCCC.

56.     Ms. Torres applied for and received disability accommodations from LCCC due to her migraines.

57.     Medical records from December 2018 and January 2019 show that Ms. Torres reported she was missing school due to her pain.

58.     In early 2019, Ms. Torres began attending an accelerated bachelor's degree program at Muhlenberg College.

59.     On February 14, 2019, Ms. Torres spoke with Muhlenberg College to discuss academic accommodations due to her migraines.

60.     Ms. Torres advised that her migraines had improved in recent months, but still impacted her daily life.

61.     Ms. Torres informed Muhlenberg College that her migraines continued to be active intermittently and estimated that she had them four to five times per month.

62.     Ms. Torres filed a written accommodation request with Muhlenberg College dated February 28, 2019, wherein she reported having chronic migraines and difficulty focusing and looking at a computer screen for any long period, as well as being sensitive to lights and sounds.

63.     Ms. Torres also stated that her migraines decreased her quality of life, could result in her being nauseous and bedridden, and could make her unable to drive, concentrate, or go to work or school.

64.     Ms. Torres attached an FMLA certification to the request, in which neurologist Susan Newhart stated that Ms. Torres's migraines were "lifelong;" that she would need treatment

visits at least twice per year; that her "migraines can occur at any time;" that her migraines may be associated with "visual aura, blurred vision, photophobia, phonophobia, nausea/possibly vomiting;" and "can cause inability to concentrate, focus, and drive."

65.     On April 25, 2019, one of Ms. Torres's advisors, stating Ms. Torres claimed to have some accommodations, sent an email to Muhlenberg's Office of Disability seeking confirmation that Ms. Torres had disability accommodations.

66.     Ms. Torres testified at trial that she did not utilize any of the accommodations prior to the collision.

67.     After the collision, Ms. Torres continued to attend Muhlenberg College.

68.     In December 2020, Ms. Torres graduated from Muhlenberg College with a Bachelor of Arts in Business Administration.

69.     Ms. Torres enrolled in a master's degree program at St. Joseph's University in January 2021.

70.     Ms. Torres did not finish the master's degree program because, according to her trial testimony, of the symptoms she was experiencing combined with the challenging nature of the program and the absence of the teammates she had in Muhlenberg College.

**D.     Ms. Torres's Work History Before and After the Collision**

71.     In 2017,[5] Ms. Torres began working for the Lehigh Valley Health Network ("LVHN").

72.     In June 2018, she was issued a written warning due to the number of times in the previous twelve months that she had requested to leave early or had taken time off due to illness.

73.     Medical records from January 17, 2019, show that Ms. Torres reported she continued to miss work with FMLA due to her pain.

74.     Ms. Torres was directed to "continue with current FMLA- may have late starts and early leaves daily."

75.     When Ms. Torres resigned from LVHN in February 2019, she had used all sixteen days of sick leave and all paid time off.

76.     From February 7, 2019, until August 20, 2019, Ms. Torres worked full time for Ideal Concepts, Inc. as a Licensing Specialist.

77.     As a result of the collision on May 31, 2019, Ms. Torres missed work at Ideal Concepts, Inc. between June 3, 2019, and August 20, 2019.

---

[5]     Ms. Torres's work history prior to 2017 is not pertinent to this Opinion.

78.     Her weekly salary was $634.62.

79.     Although Ms. Torres was not medically cleared to return to work on July 24, 2019, she tried to go back to work for financial reasons.

80.     Ms. Torres testified at trial that she did not feel well at work on July 24, 2019, due to migraines and pain in her neck, back, right shoulder, and arm, and that she did not work the month of August.

81.     Ms. Torres resigned from Ideal Concepts, Inc. on August 20, 2019.

82.     From September 11, 2019, through March 1, 2021, Ms. Torres was employed at Randstad as an Administrative Assistant and/or Recruiting Coordinator and/or Talent Management Coordinator and/or HR Partner.

83.     Ms. Torres testified at trial that she chose to work for Randstad instead of Ideal Concepts because, *inter alia*, even prior to the collision she had been trying to break into the industry and it offered better pay.

84.     From on or about March 1, 2021, through May 2, 2021, Ms. Torres worked for Cielo as a Recruiter.

85.     Beginning in August 2021 and continuing through the time of trial, Ms. Torres was employed with Korn Ferry as a Senior Recruiter.

86.     She works remotely.

**E.     Ms. Torres's Medical Conditions/Treatment Before the Collision**

87.     Ms. Torres was diagnosed with migraine headaches at age nineteen.

88.     Migraines are a type of headache, which is a general term referring to pain about the head.

89.     In April 2017, Ms. Torres went to the emergency room for a lifting or overuse injury to her right shoulder.

90.     In October 2017, Ms. Torres was diagnosed with anxiety and depression.

91.     Ms. Torres has a long history of migraine headaches.

92.     Before seeing a neurologist, she attempted to treat her migraines with her primary care provider.

93.     In June 2018, Ms. Torres visited a neurology practice.

94.     In a Headache Patient Packet and Headache Impact Test, Ms. Torres described herself as only randomly being headache-free.

95.     Ms. Torres described experiencing many symptoms associated with her migraine condition, including nausea, vomiting, light sensitivity, sound sensitivity, odor sensitivity, diarrhea, blurred vision, anxiety, irritability, decreased appetite, concentration problems, memory problems, confusion, loss of balance, vertigo, and double vision.

96.     She indicated that her headaches caused her to "discontinue everything except [her] most important activities" and "discontinue all activities and stay in bed."

97.     Ms. Torres reported that she "always" wishes she could lie down and "very often" felt too tired to do work or daily activities and felt fed up or irritated because of her headaches.

98.     Medical records from September 19th, 2018, note occipital neuralgia.

99.     During a neurology visit on November 8, 2018, Ms. Torres reported that she had been having headaches daily since June 2018.

100.     She reported symptoms including "blurry vision, feeling off balance, nausea, vomiting, [being] sensitive to light and sound [and] computer screens."

101.     Ms. Torres's migraines significantly worsened from June 2018 to December 2018, requiring escalating treatment that included numerous injections, intravenous infusions, and various medications.

102.     On December 10, 2018, Ms. Torres received her first Botox injection to treat her migraines.

103.     On December 23, 2018, she visited the emergency room to receive a left-sided nerve block, a DHE injection, Ketorolac, and Zofran IV for her migraines.

104.     Four days later, on December 27, 2018, Ms. Torres returned to her neurology practice requesting intramuscular DHE, Zofran, and Ketorolac.

105.     Ms. Torres reported that the frequency and pain severity of her headaches had increased.

106.     The nurse practitioner prescribed Ajovy, with eleven refills.

107.     Ajovy is a self-injectable medication that Ms. Torres took at home once a month, beginning in December 2018.

108.     Ms. Torres returned to the neurology practice on January 17, 2019, because although her symptoms had improved after receiving Botox and Ajovy, she continued to experience migraines and associated symptoms.

109.     Ms. Torres reported that she was getting the most benefit from chiropractic care.

110.     The medical records show that Ms. Torres reported the frequency of her migraines as "3x week" with or without medication.

111.    It was noted that Ms. Torres experienced "fatigue, back pain, neck pain, neck stiffness, difficulty with concentration, stress, and sleep disturbance," and continued to experience blurry vision, feeling off balance, nausea, vomiting, and sensitivity to light and sound and computer screens.

112.    In addition to her preexisting diagnosis of intractable chronic migraines, Ms. Torres was also diagnosed with "Bilateral occipital neuralgia."

113.    Ms. Torres was directed to "continue on Ajovy and Botox and chiropractor," and to "try JEC compound."

114.    Ms. Torres refilled her prescriptions for Ajovy in April 2019, June 2019, August 2019, October 2019, November 2019, and December 2019.  Each prescription dispensed two syringes: one a month.

115.    Between January 17, 2019, and the collision on May 31, 2019, Ms. Torres did not go to the emergency room or seek outside treatment for her migraines.

**F.    Ms. Torres's Medical Conditions/Treatment After the Collision**

116.    According to the hospital records from May 31, 2019, Ms. Torres was sitting on the bed talking to the insurance company in no acute distress.

117.    She reported neck and right shoulder/arm pain, but denied headache, blurred or double vision, nausea, and vomiting.

118.    Ms. Torres was diagnosed with a whiplash injury to the neck.

119.    Two days after the collision, on June 2, 2019, Ms. Torres returned to the hospital complaining of right arm/shoulder pain, mid-back pain, and right-sided neck pain.

120.    Ms. Torres denied any head injury in the collision and reported no visual disturbance, dizziness, weakness, light-headedness, nausea, vomiting, and/or headaches.

121.    On June 5, 2019, Ms. Torres went to the hospital complaining of acute pain in her right shoulder, which she reported had been increasing since the collision.

122.    Ms. Torres reported that the burning and tingling started after the collision, as well as numbness from the right side of her neck down to her hand.

123.    An x-ray of the right shoulder revealed no acute fracture or dislocation.

124.    There is no indication in the records that Ms. Torres complained of headaches or other neurological symptoms, such as dizziness, vision problems, or sensitivity to light or sound.

125.    On June 12, 2019, Ms. Torres was evaluated by St. Luke's for physical therapy ("PT") on her upper right extremities.

126.     Ms. Torres reported pain in her neck and increasing tingling and numbness in her right upper extremity to the extent she was unable to move her neck or shoulder without pain.

127.     Ms. Torres also reported headaches and tinnitus in her right ear, but denied, *inter alia*, disturbed sleep, dizziness, and vision changes.

128.     On June 16, 2019, Ms. Torres returned to the hospital for an MRI of her right shoulder and cervical spine.

129.     The MRIs did not reveal any tear, fracture, or abnormality.

130.     There is no indication in the records that Ms. Torres complained of headaches or other neurological symptoms.

131.     On June 19, 2019, Ms. Torres was evaluated by Dr. Randy Jaeger, an orthopedic surgeon, for right shoulder pain following the collision.

132.     She reported right arm pain, burning pain at the base of her neck, with some radiation into her fingers, as well as tingling and numbness in her fingers.

133.     Ms. Torres also reported that she believed her headaches had returned.

134.     After diagnostic studies and clinical exam, Dr. Jaeger found no structural damage to Ms. Torres's right shoulder, but recommended therapy to minimize the risk of frozen shoulder.

135.     On June 20, 2019, Ms. Torres went to the hospital complaining of chest pain on breathing.

136.     An x-ray of Ms. Torres's chest and ribs was performed, which revealed no fractures or issues.

137.     There is no indication that Ms. Torres complained of headaches or other neurological symptoms.

138.     On June 24, 2019, Ms. Torres was evaluated by Dr. Charles Norelli, a physiatrist, for neck and upper back pain.

139.     The cervical x-rays and MRI report showed no significant abnormalities.

140.     Dr. Norelli reported that Ms. Torres's exam was consistent with myofascial pain and that it was unlikely her pain was related to nerve damage.

141.     Myofascial pain is basically a sprain and strain.

142.     Dr. Norelli recommended physical therapy.

143.    Between June 26, 2019, and July 31, 2019, Ms. Torres had approximately thirteen physical therapy sessions with St. Luke's for her shoulder, each time reporting various levels of pain or discomfort.

144.    During this time, specifically between June 24, 2019, and July 11, 2019,[6] Ms. Torres also received treatment from Comprehensive Chiropractic for pain, discomfort in her neck and back, and some right-sided weakness.

145.    On July 21, 2019, Ms. Torres went to the emergency room to have a thyroid cyst drained.

146.    The records indicate that Ms. Torres was "in no acute distress whatsoever" and was negative for dizziness, headaches, light-headedness, nausea, vomiting, tingling arms and legs, and weakness.

147.    On July 24, 2019, Ms. Torres had a routine visit to her treating neurology practice, where she was treated by a physician assistant.

148.    Ms. Torres had muscle strength "5/5 in all major muscle groups."

149.    Ms. Torres reported that since the collision, she had been having neck pain, trouble focusing, fatigue, and increased headaches.

150.    According to the records, Ms. Torres stated that she was having two migraines per month, which increased to four (4) a month after the collision.

151.    She also stated her headaches were "unchanged" since her visit in January 2019, at which time Ms. Torres had reported the frequency of her headaches to be much higher at "3x week" with or without medication, which had dropped to four to five times per month in February 2019 according to her academic accommodations request with Muhlenberg College.

152.    The physician assistant concluded, based on subjective reports, that Ms. Torres "likely [] has a mild concussion from whiplash injury" and referred her to a concussion clinic.

153.    Based on the physician assistant's diagnosis of a concussion, Ms. Torres had a physical therapy ("PT") appointment on August 8, 2019.

154.    Ms. Torres reported that she was getting help cooking, cleaning, and doing laundry.

155.    During a PT session on August 19, 2019, Ms. Torres stated that the weather was increasing her headaches and that her migraines were worse since having to discontinue her migraine injections due to insurance.

---

[6]    According to the records, treatment was expected to be completed by October 24, 2019, but there are no records after July 11, 2019.

156.    On September 26, 2019, at her last PT session, Ms. Torres reported that she had no headaches "for past few days."

157.    Ms. Torres had a follow-up visit with neurology on December 4, 2019.

158.    Ms. Torres reported that she had increased migraines since the collision, but that her migraines were improving.

159.    In December 2019, Ms. Torres reported that although improving, she had increased migraines since the collision, and reported the frequency of her headaches as "2x week" with medication and "3x week" without medication.  This frequency is less than she reported in January 2019 and in one of her reports in July 2019.

160.    In April 2020, Ms. Torres had an MRI, which was normal/stable.

161.    At her next neurology follow-up visit in May 2020, Ms. Torres noted worsening migraines since transitioning to all online work and school in March of 2020.

162.    She reported the frequency of her migraines as daily since mid-March.

163.    Ms. Torres indicated that triggering factors for her migraines were weather, stress, and computer screens.

164.    In May 2020 and again in September 2020, Ms. Torres reported that the frequency of migraines had increased and averaged "2x week" with medication and "3x week" without medication.  This frequency was not increased from her December 2019 visit and is not increased from reports before the collision.

165.    In November 2020, Ms. Torres had a follow up visit with neurology and reported "daily headaches with 2-4 severe headaches per week."

166.    That month, Ms. Torres had an MRA of the neck, which was unremarkable, and a brain MRI, which was normal.

167.    At each of her neurology visits, Ms. Torres reported migraine-related symptoms such as nausea, difficulty with concentration, and sensitivity to light/sound.

168.    Two months later, Ms. Torres reported that her headaches had been daily since the collision.  This report is contrary to her reports in July 2019, December 2019, May 2020, and September 2020.

169.    Between September 2020 and March 2021, Ms. Torres received occupational and/or physical therapy at Good Sheperd Rehabilitation Hospital for cognitive issues, although some of the records note pain to her shoulder/neck.

170.    Ms. Torres completed questionnaires on December 4, 2020, and January 15, 2021, "designed to help [Good Sheperd Rehabilitation Hospital] better understand how [her] neck pain affects [her] ability to manage everyday life activities."

171.    Ms. Torres twice reported that she could "look after [herself] normally, but it causes extra pain."

172.    She stated that she could do "most" or "only" her "usual work," and that she "can't drive as long as [she] want[s] because of moderate neck pain."

173.    According to medical records from January 2021, Ms. Torres reported that her headaches have been daily since the collision.

174.    Between November 18, 2020, and February 13, 2021, Ms. Torres was treated with acupuncture, heat, and massage at Lehigh Valley Oriental Med Centre for shoulder/neck/back pain.

175.    Between March 6, 2021, and October 2, 2021, Ms. Torres received twenty-two acupuncture treatments for back and/or neck pain.

176.    Ms. Torres visited her treating neurology practice in April 2021 and in September 2021, each time reporting that she has migraines on average once per week.

177.    In September 2021, she was "negative" for all other symptoms, despite having had to discontinue Ajovy and switch to a new medication in June 2021 due to insurance issues.

178.    On January 28, 2022, Ms. Torres was evaluated for a brachial plexus injury by Dr. Nathan Miller, an upper extremity specialist, and underwent an EMG the following month.

179.    Dr. Miller found no evidence of brachial plexus injury, nor any signs of complex regional pain syndrome ("CRPS").

180.    Dr. Miller reported that on physical examination Ms. Torres had "great muscle strength" and there was no swelling in her joints.

181.    Dr. Miller noted that in the setting of a motor vehicle accident where the contact between the vehicles occurred on the passenger side, a brachial plexus avulsion injury was unlikely.

182.    Dr. Miller ordered an EMG and MRI.

183.    Ms. Torres returned to Dr. Miller on February 28, 2022, to discuss the results of the EMG and MRI.

184.    Dr. Miller determined that the EMG and MRI showed very mild carpal tunnel syndrome on the right.

185.    Dr. Miller reported that both the EMG and the MRI failed to demonstrate any evidence of a brachial plexopathy or abnormalities.

186.    Dr. Miller explained to Ms. Torres, "I do not have any objective findings that would explain [your] neck and shoulder pain."

187.    Dr. Miller had "no further treatment recommendations."

188.    The February EMG was conducted by Dr. Josh Krassen.

189.    Dr. Krassen similarly interpreted the results as showing only a mild right-sided carpal tunnel syndrome and no evidence of a brachial plexus injury or cervical radiculopathy.

190.    Dr. Krassen was in the best position to interpret the EMG because he is the only one who saw the wave forms from which he assigned the numbers that all subsequent doctors had to rely upon.

191.    No treating physician ever diagnosed Ms. Torres with a brachial plexus injury.

192.    At trial, Ms. Torres testified that she continues to experience pain, ranging from burning, stabbing pains, stiffness, and numbness, in her right arm and right shoulder, as well as migraine headaches.

193.    She testified that pain and soreness in her neck, back, right shoulder, right arm, and right hand began the day of the collision and continued for several days.

194.    Ms. Torres stated that the pain in her shoulder limits her ability to perform daily activities, including, *inter alia*, opening windows, combing and blow-drying her hair, brushing her teeth, bathing, doing laundry, washing dishes, vacuuming, dusting, cooking, and carrying heavy items such as grocery bags.

195.    She also testified that any physical activity, specifically including cleaning and vacuuming, results in an increased heart rate, causing her lightheadedness.

196.    She blamed the lightheadedness for why she "had to cancel [her] gym membership."

197.    Ms. Torres testified that since the collision, her memory is not the same, she has forgotten past memories, she has trouble finding words, she has to set reminders, and she has balance issues that she did not have previously.

198.    Ms. Torres testified that her personal and social life has changed since the collision in that she cannot engage with her goddaughter and children the way she was able to before the collision, she has a hard time at family gatherings because of the noise, she no longer enjoys amusement rides or places with large crowds/noises/lights, and has trouble going to the beach because of the brightness of the sun.

199.    She testified that since the collision, she has had daily headaches and that her migraines, which were previously three times a month, increased to eight or ten times a month.

200.    Ms. Torres testified, contrary to her past medical records, that she did not have breakthrough migraines, blurry vision, dizziness, nausea, vomiting, and sensitivity to light/sound prior to the collision.

201.     When asked about the contradiction between her testimony and the medical records, which show she experienced each of these conditions prior to the collision, Ms. Torres blamed the collision for impacting her memory.

202.     Ms. Torres continues to suffer headaches and related migraine symptoms.

**G.     Changes in Ms. Torres after the Collision- Ms. Torres's Witnesses**

203.     Ms. Torres's older sister, Joanne Gerez, testified for that she saw a complete change in her sister after the collision.

204.     She explained that Ms. Torres's migraines are dramatically worse and that she can no longer play with Ms. Gerez's son the way she did before the collision.

205.     Ms. Gerez testified that Ms. Torres has memory loss, forgetting discussions in the middle of conversations and childhood memories.

206.     Ms. Gerez testified that they use to go out shopping and to dinner, but since the collision Ms. Torres is detached from the family, leaves family gatherings early, and is no longer happy.

207.     Aside from the first "couple of months" after the collision, Ms. Gerez did not live with Ms. Torres.

208.     Ms. Torres has lived alone since moving out of her sister's home.

209.     Ms. Gerez did not work, attend school, or go to all medical appointments after the collision with Ms. Torres.

210.     Ms. Gerez has limited knowledge of Ms. Torres's prior medical history.

211.     Cristina Moran testified that she went to school with Ms. Torres at Muhlenberg College beginning in January 2019.

212.     They were friends before and after the collision in May 2019, but not before attending Muhlenberg College.

213.     Ms. Moran, Ms. Torres, and one other person were in a group of business majors with a concentration in human resources, which attended lecture classes together approximately three to four hours once a week and met outside of the classroom for at least four hours at a designated time and day.

214.     Ms. Moran and Ms. Torres were in other groups consisting of seven, four, and three members.

215.     Ms. Moran testified that prior to the collision, Ms. Torres pulled her own weight and finished projects ahead of time, but afterwards Ms. Moran and the other teammates took on more work that was the responsibility of Ms. Torres.

216.     Ms. Moran does not remember Ms. Torres needing to leave class early because of a headache prior to the collision.

217.     Ms. Moran testified that after the collision, Ms. Torres would complain of a lot of headaches, had to go to doctor's appointments, would arrive late to, or leave early from, classes, was unable to attend online classes for long periods because the screen bothered her, and had to cut team meetings short because she was not feeling well.

218.     Ms. Moran had no knowledge of the disability accommodations given to Ms. Torres by Muhlenberg College prior to the collision.

219.     Ms. Moran did not have any specific knowledge of Ms. Torres's medical treatment, nor did she attend any of her medical appointments.

220.     Ms. Moran never lived or worked with Ms. Torres.

221.     Ruth Faust testified by videotaped deposition.

222.     Ms. Faust has known Ms. Torres for more than twenty years, since middle school.

223.     Ms. Torres is the godmother of one of Ms. Faust's children.

224.     Ms. Faust considers Ms. Torres her sister.

225.     They saw each other daily until Ms. Faust went away to college, then it became about once every two months, but they continued to talk daily.

226.     Since May/June 2018, when Ms. Faust moved back to Pennsylvania, they would see one another a couple times a month.

227.     Ms. Faust described Ms. Torres before the collision as "dependable," "works hard," "always very direct," "a Type A," "quick-witted," and someone that would "definitely tell you what's on her mind."

228.     She said Ms. Torres recalled things well and would "hold you to it, to what you said" so they would banter back-and-forth with a lot of sarcasm.

229.     Ms. Faust testified that after the collision, she would have to repeat herself in conversations because Ms. Torres would forget and get lost in a conversation, such that they did not have the same banter as before.

230.     Ms. Faust testified that Ms. Torres wrote things down so she could remember them and had to work extra hard.

231.     She testified that Ms. Torres would get over tired and have to take breaks or lie down, and that she could see the pain in Ms. Torres's face.

232.    Ms. Faust testified that Ms. Torres's headaches were more frequent, which prevented them from going out as often as before the collision.

233.    Ms. Faust, who also suffers from migraine headaches, often spoke with Ms. Torres about her headaches and treatment.

234.    Ms. Faust did know about any specific migraine treatment before or after the collision.

235.    Ms. Faust did not know what medical conditions Ms. Torres had been diagnosed with before the collision, with whom she treated, or how often she treated.

236.    Ms. Faust never lived or worked with Ms. Torres.

237.    The Court finds the testimony of Ms. Gerez, Ms. Moran, and Ms. Faust to be truthful and credible;[7] however, these witnesses have limited knowledge about Ms. Torres's medical conditions and treatments before and after the collision, as well as limited knowledge about her disability accommodations.

238.    Aside from Ms. Torres living with Ms. Gerez the first couple of months after the collision, none of these witnesses live or work with Ms. Torres.

239.    None of these witnesses are qualified to offer an opinion as to the medical reason for Ms. Torres's allegedly changed behavior after the collision.

**H.    General Facts Regarding a Concussion**

240.    A person can sustain a concussion without a direct blow to the head if the brain experiences acceleration/deceleration inside the skull, i.e. a violent shaking of the head.

241.    The American Association of Neurology has three grades of concussion.

---

[7]    In assessing the credibility of all witnesses, the Court has considered:
>        (1) the opportunity and ability of the witness to see or hear or know the things the witness testifies to;
>        (2) the quality of the witness's understanding and memory;
>        (3) the witness's manner while testifying;
>        (4) whether the witness has an interest in the outcome of the case or any motive, bias or prejudice;
>        (5) whether the witness is contradicted by anything the witness said or wrote before trial or by other evidence;
>        (6) how reasonable the witness's testimony is when considered in the light of other evidence that you believe; and
>        (7) any other factors that bear on believability.
Model Civil Jury Instruction 1.7

242.    A Grade 1 concussion, the mildest, does not require loss of consciousness but does require being temporarily confused for less than fifteen minutes.

243.    A Grade 2 concussion requires being temporarily confused for more than fifteen minutes.

244.    A Grade 3 concussion, the most serious, requires loss of consciousness.

245.    Concussion symptoms usually develop within twenty-four to forty-eight hours, but can develop up to a week later.

246.    Most concussion symptoms improve after eight to twelve weeks.

247.    Symptoms of a concussion, as well as post-concussion syndrome, can include headaches, dizziness, blurred vision, nausea, vomiting, confusion, irritability, trouble concentrating, and light/sound sensitivity.

248.    There are no objective tests to measure many of these symptoms, to measure concussions, or to measure pain.

249.    Only a person that sustained a concussion can develop post-concussion syndrome, but most do not.

**I.    Ms. Torres's Expert Witness Testimony**

250.    Dr. Joseph Moeller testified as an expert witness for Ms. Torres in the field of neurology, including expertise in the fields of concussions, post-concussive syndrome, migraine headaches, neck pain, and injuries to the brachial plexus.

251.    Dr. Moeller is board certified in neurology.

252.    Dr. Moeller has been practicing neurology since 2005 and exclusively since 2009.

253.    In his practice, Dr. Moeller treats patients with concussions, post-concussion syndrome, aggravation of migraines brought on by a traumatic event, headaches generally, and injuries to the brachial plexus.

254.    He performs, reads, and interprets EMGs daily.

255.    Dr. Moeller met Ms. Torres in October 2021 for a neurological evaluation and had her complete a post-concussion symptom questionnaire, which lists a variety of symptoms including cognitive, pain, balance, and emotional lability and asks the patient to list the severity of each over time.

256.    Dr. Moeller issued three reports in connection with his opinions in this case, dated October 18, 2021, June 14, 2022, and July 22, 2022, all of which expressed therein and at trial were to a reasonable degree of medical certainty.

257.    Dr. Moeller drafted his initial report prior to reviewing Ms. Torres's prior medical records.

258.    Dr. Moeller drafted his second report after reviewing Ms. Torres's prior medical records, Dr. Miller's notes from January/February 2022, and the February 2022 EMG.

259.    He drafted the third report after reviewing Dr. Harris's expert report.

260.    Dr. Moeller did not watch the police officer's body camera footage from the day of the collision.

261.    First, Dr. Moeller opined that Ms. Torres sustained a concussion in the collision with subsequent post-concussion syndrome, as well as exacerbation of her previously existing migraine headaches and post-traumatic cervicogenic headaches.

262.    In describing post-traumatic cervicogenic headaches, Dr. Moeller testified that a patient that sustains a whiplash injury can develop headaches that emanate from the neck and are caused by injuries to the back of the neck.

263.    Dr. Moeller testified that on the post-concussion symptom questionnaire Ms. Torres scored sixty out of a possible sixty-four, which was indicative of severe concussion symptomatology.

264.    Dr. Moeller testified that Ms. Torres had had improvement, but that symptoms can wax and wane in severity.

265.    During the physical examination, Dr. Moeller noticed that Ms. Torres had difficulty finding words, with recall, and putting her thoughts into sentences, which he opined indicated a deficit in short-term recall.

266.    Dr. Moeller testified that Ms. Torres became visibly upset when discussing how long she had symptoms and that the mental status exam showed Ms. Torres had some difficulty with attention and concentration tasks.

267.    Dr. Moeller concluded that Ms. Torres's migraines "have changed in quality, frequency, and severity" since the collision and "are, once again, refractory to treatments that were previously effective."

268.    Dr. Moeller testified it was significant in forming his opinion that Ms. Torres had no medical treatment for migraines after January 17, 2019, until the collision on May 31, 2019, reasoning that her treatment with Ajovy and Botox caused "fantastic improvement" in her previous treatment history.

269.    In forming his opinions, Dr. Moeller relied on Ms. Torres's subjective reports to him more than two (2) years after the collision even where they were contradicted by her earlier reports or inconsistent with her medical records.

270.     Dr. Moeller admitted that Ms. Torres failed to mention her prior diagnosis for anxiety and depression; her numerous trips to the emergency room for chest pain, pelvic pain, abdominal pain, spine pain, right shoulder blade pain, and back pain; and her history and/or symptoms of occipital neuralgia.

271.     Second, Dr. Moeller opined that Ms. Torres sustained a post-traumatic brachial plexus traction injury in the collision.

272.     During his motor exam of Ms. Torres, Dr. Moeller found some reduced power in Ms. Torres's right deltoid, biceps, and triceps; reduced sensation to pinprick and temperature in the right upper lateral arm, lateral forearm, and in the hand; and impairment in cortical modalities as well as her primary sensory modalities, which he concluded was consistent with injuries to either the nerve roots of the cervical spine, the brachial plexus, or peripheral nerve injury in the arm itself.

273.     Dr. Moeller did not know if Ms. Torres had reduced power before the collision.

274.     Dr. Moeller testified that the February 2022 EMG provided the objective data that confirmed his diagnosis.

275.     He used onset-to-peak measurement, which measures from the baseline to the peak of the waveform.

276.     Dr. Moeller testified that he had never seen an EMG read peak to trough, which measures from the top of the waveform to the bottom.

277.     Dr. Moeller stated that given Ms. Torres's neck pain and examination results, he was looking for a plexus injury.

278.     He explained that although the amplitudes of Ms. Torres's upper extremities are well into normal range, a comparison of the amplitudes on her left and right side is significant.

279.      The amplitudes on the left side is a measure of 74 micro volts whereas the right side is 21.6 micro volts, which is an approximately seventy percent (70%) reduction in amplitude.

280.     The left ulnar sensory amplitude is 48 micro volts compared to 24 micro volts on the right, which is a fifty percent (50%) difference.

281.     Dr. Moeller testified that the side-to-side comparison has a specific cut off generally at fifty percent (50%).

282.     He explained that you might not diagnose with less than fifty percent (50%) unless the history and physical exam is indicative of what you are looking for, and that he had the benefit of knowing Ms. Torres's history and physical examination.

283.     The EMG also revealed a very mild indication of carpal tunnel syndrome.

284.    Dr. Moeller testified that patients with carpal tunnel syndrome have a prolongation of latency, but Ms. Torres's prolongation is only about two or two-and-a-half percent (2%-2½%), which would not cause a seventy percent (70%) and fifty percent (50%) reduction in amplitude.

285.    Dr. Moeller reviewed the lifecare plan report prepared by Alex Karras and agreed that the treatment therein was consistent with his recommendations.

286.    Mr. Karras, a certified life care planner, testified as an expert witness for Ms. Torres.

287.    Mr. Karras testified that over the course of Ms. Torres's projected life span (forty-eight years) her medical costs would be $3,128,695.88.

288.    Mr. Karras based his opinion exclusively on the medical recommendations of Dr. Moeller.

289.    Although Mr. Karras reviewed Ms. Torres's medical records, he is not a doctor and did not check them with Dr. Moeller's report.

290.    Mr. Karras did not consult any of Ms. Torres's treating physicians.

291.    Mr. Karras did not consider the opinions of Dr. Harris.

292.    Mr. Karras did not alter his projections based on any medical records or doctors that disagreed with the recommendations of Dr. Moeller.

293.    Mr. Karras testified that empirical evidence about how Ms. Torres has been doing since he rendered the calculations in the lifecare plan would not cause him to revisit his calculations.

294.    Mr. Karras's lifecare plan assumes Ms. Torres will need treatment for the rest of her life, with no contingencies should her condition(s) improve or worsen.

**J.    The United States' Expert Witness Testimony**

295.    Dr. Lee Harris testified as an expert witness for the United States in the field of neurology, including expertise in the fields of migraines and headaches, concussions, post-concussion syndrome, neck and shoulder pain, and injuries to the brachial plexus.

296.    Dr. Harris also has a subspecialty board certification in clinical neurophysiology, which includes training in EEG testing, electro-diagnostic medicine, and EMG testing.

297.    Dr. Harris has been practicing neurology since 1989, ten years of which he served as Chief of the Neurology Department Abington Hospital.

298.    Dr. Harris has treated patients with concussion and post-concussion syndrome, neck and shoulder pain, and brachial plexus injury.

299.    Dr. Harris has interpreted thousands of EMGs.

300.    Dr. Harris prepared a report in connection with his opinions in this case, all of which expressed therein and at trial were to a reasonable degree of medical certainty.

301.    Dr. Harris, among other things, physically examined Ms. Torres, reviewed her pre- and post-collision medical records, and watched the police officer's body camera footage taken at the scene of the collision, all before formulating his opinions.

302.    First, Dr. Harris opined that Ms. Torres did not suffer a concussion nor experience post-concussion syndrome with cognitive impairment as a result of the collision.

303.    Dr. Harris reasoned that the body camera footage from the scene of the collision shows that Ms. Torres did not lose consciousness, nor did she exhibit any concussion symptoms, nor did she display signs of confusion or being dazed.

304.    Dr. Harris testified that Ms. Torres appears to be shaken up from being in a collision, which is not unexpected, but that although she asked the officer for her keys when she already had them, it would be a "stretch" to call that confusion and "a far cry from saying somebody's dazed and confused from the onset to suggest a concussion."

305.    Dr. Harris further explained that according to medical records from May 31, 2019, June 2, 2019, and June 5, 2019, Ms. Torres did not experience any concussion symptoms within the timeframe that such symptoms must develop.

306.    Ms. Torres specifically denied visual disturbance, dizziness, nausea, vomiting, and/or headaches in her first two hospital visits after the collision, and there is no reference to any other these symptoms on her third visit.

307.    Rather, the first time any reference to headaches appears in the medical records is on June 12, 2019, twelve days after the collision.

308.    Additionally, Dr. Harris testified that Ms. Torres reported having all the symptoms of post-concussion syndrome prior to the collision.

309.    Similarly, Ms. Torres was diagnosed with bilateral occipital neuralgia, dizziness, and imbalance after the collision, but all those diagnoses were also made before the collision.

310.    Dr. Harris testified that because the symptoms of migraines and of post-concussion syndrome overlap, and given Ms. Torres's prior reports of these symptoms, the timing as to when she experienced them after the collision is significant.

311.    According to the medical records, Ms. Torres initially denied having any symptoms and such symptoms seemed to escalate with the passage of time.

312.    Dr. Harris reasoned that such a time course is opposite of what it should be if Ms. Torres did in fact have a concussion and post-concussion syndrome as a result of the collision.

313.     He explained that if someone did sustain a concussion and develop post-concussion syndrome, symptoms would be worse at the very beginning and then would gradually improve with the passage of time.

314.     Dr. Harris reasoned that Ms. Torres's complaints of worsening symptoms over time "doesn't make any sense for a physical neurological injury" and "makes no sense for a diagnosis of minor concussion without loss of consciousness."

315.     He noted other issues with Ms. Torres's subjective reports.

316.     For example, Ms. Torres reported having such memory trouble that she forgot where she lived and would leave the stove on when she went to bed at night, which is significant cognitive impairment, but she also managed to have a 4.0 grade point average ("GPA") in the couple of years of immediately after the accident, which does not support cognitive impairment.

317.     Dr. Harris opined that Ms. Torres's subjective complaints are psychological in origin.

318.     Stress, anxiety, and depression are psychological issues.

319.     Dr. Harris opined that Ms. Torres does not require any neuropsychological testing or psychiatric evaluations or treatment in relation to the collision.

320.     Dr. Harris explained that Ms. Torres had a long history of depression and anxiety, as well as multiple complaints of pain in various areas of her body prior to the collision that her doctors could not diagnose or explain.

321.     Dr. Harris disagreed with Dr. Moeller's report that Ms. Torres was diagnosed with a concussion by multiple physicians.

322.     Dr. Harris explained that nearly two months after the collision when Ms. Torres reported headaches and difficulty concentrating, the physician assistant (not a neurologist) interpreted her complaints to mean Ms. Torres "likely [] has a mild concussion from whiplash injury," and that this diagnosis was simply carried into future medical records.

323.     Second, Dr. Harris opined that Ms. Torres did not suffer an exacerbation of her pre-existing migraines as a result of the collision.

324.     As discussed, the migraine-related symptoms that Ms. Torres suffered after the collision were also experienced prior to the collision.

325.     Dr. Harris testified that the significant uptick in the frequency of Ms. Torres's migraines the year after the collision was a result of online learning during the coronavirus pandemic.

326.     When questioned about the lack of medical records between January 17, 2019, and the collision, Dr. Harris reasoned that Ms. Torres went through similar periods where there was no treatment both before and after the collision.

327.    Dr. Harris explained that Ms. Torres's migraines are a lifelong disorder.

328.    Dr. Harris opined that Ms. Torres will need future migraine treatment possibly for the rest of her life, but not as a result of the collision.

329.    Third, Dr. Harris opined that Ms. Torres did not suffer a brachial plexus injury.

330.    Dr. Harris testified that not a single treating physician diagnosed a brachial plexus injury.

331.    He explained that brachial plexus injuries are rare because brachial plexus is a group of nerves behind the collar bone, which is well-protected from injury.

332.    Dr. Harris testified that Ms. Torres's body functions that could be impacted by a brachial plexus injury would be muscle power and sensation in her right upper limb.

333.    During his physical examination of Ms. Torres's cervical spine, she had mildly diminished range of motion in all directions, and reported subjective tenderness to the lightest touch throughout her spine, which Dr. Harris opined was "entirely non-physiological."

334.    His motor examination revealed no signs of muscle atrophy, weakness, atypical reflexes, or an atypical gait while walking.

335.    Dr. Harris testified that according to medical records, Dr. Miller and other treating doctors also found that Ms. Torres had normal muscle strength.

336.    Dr. Harris reviewed Ms. Torres's EMG from February 2022 using peak-to-trough measurements and found no evidence of brachial plexus injury.

337.    Dr. Harris was always trained to measure peak-to-trough, he has been using peak-to-trough measurements throughout his thirty-three years of practice, and is aware of several physicians in the community where he practices that also measure peak-to-trough.

338.    It is medically acceptable to read an EMG using either onset-to-peak or peak-to-trough numbers.

339.    Dr. Harris testified that he agreed with Dr. Moeller that a fifty percent discrepancy between the affected and unaffected side is medically significant, but concluded that the right ulnar sensory nerve amplitude was not fifty percent (50%) smaller than the left.

340.    Using peak-to-trough numbers, the left ulnar sensory response was 50.8 (not 48 as Dr. Moeller found) compared to the right 39.5 (not 24 as Dr. Moeller found).

341.    He explained that the wave form in a sensory nerve conduction study is not always even and it is the responsibility of the physician, here Dr. Krassen, to look at the wave form and move the cursors that the computer has automatically assigned in order to be accurate.

342.    The EMG report from Dr. Krassen did not include a picture of the wave forms so Dr. Harris had to rely on the numbers Dr. Krassen assigned.

343.    Dr. Harris noted that Dr. Krassen, using onset-to-peak measurements, interpreted the EMG numbers as normal and found no evidence of a brachial plexus injury.

344.    There is no objective evidence that Ms. Torres suffered a brachial plexus injury.

345.    Dr. Harris further testified that although a few of Ms. Torres's treating doctors diagnosed cervical radiculopathy based on Ms. Torres's symptoms, the EMG showed no evidence of cervical radiculopathy.

346.    Cervical radiculopathy is a disorder of the spinal nerves coming off the neck going down into the arms.

347.    Dr. Harris opined that the EMG did show that Ms. Torres had very mild right-sided carpal tunnel syndrome, but unrelated to the collision.

348.    Dr. Robert David Cipko testified as a vocational expert for the United States.

349.    Dr. Cipko has a doctorate degree is in the psychoeducational process.

350.    Dr. Cipko is a licensed psychologist and professional counselor.

351.    Dr. Cipko testified that he believes his doctorate in the psychoeducational process gave him additional insight into education and the way education affects people beyond someone who just has a degree in psychology.

352.    Among other training and experience, Dr. Cipko taught in an accelerated cohort program for adult learners that was similar to Ms. Torres's program at Muhlenberg College.

353.    All of Dr. Cipko's conclusions were made to a reasonable degree of certainty in the field of vocation.

354.    Dr. Cipko concluded that Ms. Torres's academic performance at Muhlenberg College after the collision was equal to or better than before the collision.

355.    Dr. Cipko reasoned that in Ms. Torres's spring semester of 2019 at Muhlenberg College, in which she completed two classes and withdrew from a third, she earned an A minus and an A, with a 3.85 grade point average.

356.    In her first semester after the collision (fall 2019), Ms. Torres completed three classes and received two A minuses and an A.

357.    Thereafter and until her final semester in fall 2020, Ms. Torres earned all A minus and A plus grades and maintained a 3.9 or higher grade point average.

358.    The only grade Ms. Torres received that was lower than an A minus or an A was in a multidisciplinary project for which her grade reflected the group's performance rather than solely her own individual performance.

359.    Dr. Cipko testified that there is more work with a master's program than in an undergraduate program and it is typical for someone to have difficulty going through a master's degree program.

360.    Dr. Cipko examined Ms. Torres's employment and wages before and after the collision.

361.    Dr. Cipko testified that Ms. Torres "moved along in her career path quickly after the accident" and that he was "totally impressed by her ability to substantially, significantly raise her annual income."

362.    Dr. Cipko did not see any evidence in Ms. Torres's employment records that she ever requested formal disability accommodations from any of her employers after the collision.

363.    Dr. Cipko opined that the collision did not impact Ms. Torres's employment prospects or earning capacity.

364.    This Court finds the testimony of Dr. Cipko to be credible and persuasive.

365.    Dr. Peter A. Zalenski testified as an economic expert for the United States.

366.    Dr. Zalenski testified that before the accident, Ms. Torres had only an associate's degree and earning a bachelor's degree improved her economic prospects.

367.    Dr. Zalenski testified that given Ms. Torres's description of her disability in the February 2019 accommodations request, he would have expected Ms. Torres to have a "prolonged route, requesting extra time, maybe slightly above average grades;" however, Ms. Torres was an A student and displayed upward mobility prior to the collision.

368.    In her first job after the collision, Ms. Torres had an approximate sixty percent (60%) earnings growth.

369.    Dr. Zalenski testified "that's a pretty good earnings growth," approximately double a typical earnings growth for a graduating college student.

370.    Dr. Zalenski characterized Ms. Torres's twenty percent (20%) increased annual salary in her second job following the collision as "much more above expected."

371.    Ms. Torres then had a fifty percent (50%) increase going to her third job after the collision, which Dr. Zalenski said was "extraordinary."

372.    Dr. Zalenski testified that Ms. Torres' overall economic capability in job growth in the time that he managed was two hundred percent (200%), which he explained was "fairly unprecedented to see that kind of growth.

### K.   Additional Findings as to Credibility of Expert Witnesses and Ms. Torres[8]

373.   This Court finds the expert testimony of Dr. Harris to be reasonable, accurate, credible, and more persuasive than the testimony of Dr. Moeller.

374.   Dr. Harris has thirty-three (33) years of experience compared to Dr. Moeller's seventeen (17) years.

375.   Both experts are board certified in neurology, but Dr. Harris holds additional certifications in electrodiagnostic medicine and clinical neurophysiology, which includes EEG and EMG testing.

376.   Dr. Harris reviewed all of Ms. Torres's medical records (pre- and post- collision) and the body camera footage before rendering any opinions, while Dr. Moeller did not review Ms. Torres's pre-collision medical records until after forming his first opinion and never watched the body camera footage from the day of the collision.

377.   Because Dr. Moeller did not view the body camera footage, Dr. Harris's opinion that Ms. Torres did not suffer a concussion in the collision because she did not display signs of confusion within fifteen (15) minutes of the collision is more persuasive.

378.   Dr. Harris's opinion in this regard is also consistent with this Court's finding after viewing the video that Ms. Torres did not exhibit any symptoms of concussion after the collision.

379.   Dr. Harris's opinion that Ms. Torres did not suffer a concussion in the collision because she did not develop concussion symptoms within a week of the collision is more persuasive than Dr. Moeller's opinion because it is supported by the medical records.

380.   Medical records from May 31, 2019, June 2, 2019, and June 5, 2019, show that Ms. Torres did not report and/or denied any concussion symptoms at each visit.

381.   Dr. Moeller's opinion was formed, in part, on his belief that all Ms. Torres's treating physicians diagnosed her as having a concussion, but that "diagnosis" was based merely on a physician assistant's finding approximately two months after the collision that Ms. Torres's complaints were consistent with her likely having had a concussion.

382.   Dr. Harris's opinion that the collision did not cause a concussion, as well as his opinions that the collision did not exacerbate her cognitive issues or migraines, is more persuasive than Dr. Moeller's opinions because they are consistent with Ms. Torres's continued/improved academic performance and job success after the collision.

---

[8]   In a nonjury trial, credibility determinations are in the sole province of the judge as finder of fact.  *See* Fed. R. Civ. P. 52(a); Footnote 5 *supra*; *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 191 (3d Cir. 2004) (holding "it is for the District Court Judge, as fact finder, to resolve those disagreements [among experts] by judging the credibility of the expert witnesses, resolving the conflicting evidence, and assessing the weight of the expert's testimony")

383.    For all these reasons, Dr. Harris's opinion that Ms. Torres did not suffer post-concussion syndrome is more persuasive than Dr. Moeller's opinion.

384.    Dr. Harris's opinion in this regard is also supported by the timing of Ms. Torres's symptoms, as reflected in the medical records.  The timing contradicts Dr. Moeller's post-concussive syndrome diagnosis.

385.    Dr. Harris's opinion that Ms. Torres's migraines were not worsened as a result of the collision is consistent with the chronic, waxing/waning nature of her migraines and is supported by medical records before and after the collision.

386.    Medical records from August 2019 show that Ms. Torres reported that her migraines had increased, not as a result of the collision, but as a result of discontinuing her migraine injections.

387.    Medical records from May 2020 show that Ms. Torres reported worsening migraines since transitioning to online work and school in March 2020.

388.    Dr. Harris's opinion that Ms. Torres's significant uptick in the frequency of her migraines the year after the collision was a result of the coronavirus pandemic when she was switched to online learning is reasonable because stress and looking at computer screens are triggers for her migraines.

389.    By April 2021 and continuing through at least September 2021, according to medical records from these months, the frequency of Ms. Torres's headaches were lower than she experienced prior to the collision and her headache-related symptoms were better/less than before the collision.

390.    Dr. Moeller's opinions were formed substantially on the absence of outside medical treatment for migraines after January 17, 2019; however, Ms. Torres reported symptoms of migraine headaches in her accommodation request to Muhlenberg College dated February 28, 2019, and took monthly Ajovy injections at home through the date of the collision.

391.    The absence of outside medical treatment in the months prior to the collision therefore does not contradict Dr. Harris's opinion especially because Ms. Torres had other periods before and after the collision where there was no outside medical treatment.

392.    Dr. Harris's opinions are more persuasive because the timing and progress of Ms. Torres's symptoms support his opinions and are inconsistent with Dr. Moeller's opinions.

393.    Ms. Torres informed Dr. Moeller that many of her symptoms were new after the collision, but the medical records show she had experienced each prior to the collision as well.

394.    The medical records also show that Ms. Torres changed her reports regarding the frequency of her headaches over time.

395.    As discussed previously, it was not until more than a year and a half after the collision that Ms. Torres reported for the first time that her headaches had been daily since the

collision.  The medical records show that this frequency is contrary to her reports in July 2019, December 2019, May 2020, and September 2020.

396.    Moreover, daily headaches were not uncommon to Ms. Torres, who reported having daily headaches prior to the collision between June 2018 and November 2018.

397.    Dr. Harris's opinions are more reasonable than Dr. Moeller's opinions because Dr. Harris considered the inconsistencies with Ms. Torres's subjective reports to him, to her medical providers, and within her medical records in formulating his opinion, while Dr. Moeller relied on her subjective reports even where they were contradicted by her earlier reports or inconsistent with her medical records.

398.    The fact that Dr. Moeller was not advised of Ms. Torres's pain prior to the collision to her right shoulder and back is one reason the opinion of Dr. Harris that she did not suffer a brachial plexus injury is more persuasive than the opinion of Dr. Moeller.

399.    Additionally, Dr. Harris's opinion is consistent with the findings of Dr. Norelli, who less than a month after the collision examined Ms. Torres and reviewed x-rays and an MRI.

400.    Dr. Harris's opinion is more reasonable than Dr. Moeller's opinion because the brachial plexus is well-protected and such injury is unlikely from the nature of the collision here.

401.    Dr. Harris's opinion is supported by medical records showing that Ms. Torres had normal muscle strength during numerous physical examinations after the collision and by the absence of a diagnosis of such an injury by any of her treating doctors.

402.    Dr. Harris's opinion is also consistent with the findings of Dr. Miller, who specifically examined Ms. Torres for such injury, and with Dr. Krassen, who conducted the EMG to test for such injury and was in the best position to interpret the EMG.

403.    The EMG supports Dr. Harris's opinion.

404.    For all these reasons, this Court accepts the opinions of Dr. Harris and does not accept the opinions of Dr. Moeller to the extent that they conflict.

405.    Because this Court has not accepted Dr. Moeller's opinions, it gives no weight to the lifecare plan of Mr. Karras.

406.    Next, this Court finds Ms. Torres's trial testimony to be truthful, but does not find her testimony regarding the severity and timing of her medical conditions to be credible.

407.    Ms. Torres's testimony that her headaches, vision, dizziness, and cognitive changes began a few days after the collision is contradicted by her statements to medical personnel on May 31, 2019, June 2, 2019, June 12, 2019, and July 21, 2019, specifically denying such symptoms, and by her failure to report such symptoms on June 5, 2019, June 16, 2019, and June 20, 2019.

408.    Ms. Torres's testimony that she did not report her headaches in June 2019 because she was only focusing on new, different symptoms is not consistent with her subsequent reports and trial testimony that her headaches after the collision were "quite different in nature," worse, and more frequent than before, and is not reasonable in the absence of any medical evidence showing that her headaches were any different than before the collision.

409.    Ms. Torres's testimony that she has "not had a migraine day free since May of 2019" is contradicted by the medical records in May, June, and July 2019 that were just referenced, as well as medical records from December 2019, May 2020, and September 2020 showing that Ms. Torres consistently reported the frequency of her headaches as occurring at most three times a week.

410.    It was not until more than a year and a half after the collision that Ms. Torres first reported to any medical provider that her headaches had been daily since the collision.

411.    Ms. Torres's testimony that she was "asymptomatic" from January 2019 until the collision is contradicted by her statements in her disability accommodations request with Muhlenberg College dated February 28, 2019.

412.    Ms. Torres's testimony that she did not experience vision problems, balance issues, nausea, vomiting, sensitivity to light/sound, or memory issues before the collision is contradicted by prior medical records containing her reports to the contrary.

413.    Ms. Torres's testimony that she has had significant cognitive impairments since the collision is contradicted by the medical records.

414.    Also, this testimony is not reasonable in light of, or consistent with, the evidence.

415.    Aside from the first few months immediately after the collision, Ms. Torres has lived alone and taken care of herself; she has worked full-time, advancing in her career; and she also attended college while working until her graduation more than a year and a half after the collision, achieving A-level grades.

416.    During trial, Ms. Torres did not exhibit any signs of confusion, trouble focusing, difficulty with finding her words, nor did she display any problems with balance, physical limitations, or functioning.

417.    Finally, Ms. Torres's trial testimony regarding the severity of pain to her right arm/shoulder and back since the collision is not reasonable in light of her ability to live alone and care for herself after the collision and to work full-time while also maintaining A's in college.

418.    Also weighing against the believability that her severe pain is attributable to the collision is the fact that as late as January 2019 Ms. Torres reported back pain, neck pain, and neck stiffness.

419.    Ms. Torres's testimony further lacks support from the medical records, which show full muscle strength, normal x-rays, MRIs, and EMGs, the inability of her treating physicians to find anything explain her subjective reports of pain.

II.     **CONCLUSIONS OF LAW**

A.      **FTCA - Review of Applicable Law**

Title 28 U.S.C. § 1346(b) provides: "the district courts . . . shall have exclusive

jurisdiction of civil actions on claims against the United States, for money damages, . . . for

injury or loss of property, or personal injury or death caused by the negligent or wrongful act or

omission of any employee of the Government while acting within the scope of his office or

employment. . . ."  28 U.S.C. § 1346(b)(1).

"The United States, as sovereign, is immune from suit save as it consents to be sued, and

the terms of its consent to be sued in any court define that court's jurisdiction to entertain the

suit." *United States v. Sherwood*, 312 U.S. 584, 586-87 (1941) (internal citations omitted).  "A

waiver of sovereign immunity . . . must be unequivocally expressed." *United States v. Mitchell*,

445 U.S. 535, 538 (1980) (internal quotations omitted).  The FTCA is the exclusive waiver of

sovereign immunity for tort claims against the United States for money damages "caused by the

negligent or wrongful act or omission of any employee of the Government while acting within

the scope of his office or employment." 28 U.S.C. § 1346(b)(1); *United States v. Olson*, 546

U.S. 43, 44 (2005).  Because the FTCA provides a limited waiver of the United States' sovereign

immunity, its established procedures must be strictly construed. *See White-Squire*, 592 F.3d at

456; *Livera v. First Nat'l State Bank of N.J.*, 879 F.2d 1186, 1194 (3d Cir. 1989).

An FTCA action may not be instituted unless the claimant first presents the claim to the

appropriate Federal agency seeking a sum certain.  *See* 28 U.S.C. §§ 2675(a)-(b).  The

exhaustion and sum certain requirements in § 2675(a) are "jurisdictional and cannot be waived."

*Shelton v. Bledsoe*, 775 F.3d 554, 569 (3d Cir. 2015).  An FTCA plaintiff may seek damages in

excess of the amount of the claim presented to the federal agency by meeting one of two

exceptions: (1) "where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or [2] upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b). The burden is on the plaintiff to show one of the exceptions in § 2675(b). *See Schwartz v. United States*, 446 F.2d 1380, 1381 (3d Cir. 1971).

Under the FTCA, the United States is liable to the plaintiff to the same extent that a private person would be liable in accordance with the law of the place where the act or omission occurred. *See* 28 U.S.C. § 1346(b). The FTCA caps attorney's fees at twenty-five percent of any judgment in the plaintiff's favor. *See* 28 U.S.C. § 2678. Attorneys' fees are not awarded separately. *See id.*

## B.     Negligence – Review of Applicable Law

Under Pennsylvania law, a cause of action for negligence requires that the plaintiff prove: (1) duty; (2) breach; (3) causation; and (4) damages. *See Estate of Zimmerman v. SEPTA*, 168 F.3d 680, 684 (3d Cir. Pa. 1999) (citing *Estate of Swift v. Northeastern Hosp. of Phila.*, 690 A.2d 719, 722 (Pa. Super. Ct. 1997)). To establish the causation element, the plaintiff must show that the defendant's breach was both the proximate and actual cause of injury. *See Roessing v. United States*, No. 3:19-cv-161, 2021 U.S. Dist. LEXIS 81479, at *13 (W.D. Pa. Apr. 28, 2021) (citing *Reilly v. Tiergarten Inc.*, 633 A.2d 208, 210 (Pa. Super. Ct. 1993)). "Actual causation is present when the alleged injury would not have occurred but for a certain act or presence of a condition . . . while proximate causation requires that the defendant's wrongful act be a substantial factor in bringing about the plaintiff's harm." *Id.* (internal quotations omitted). A plaintiff must make this showing by a preponderance of the evidence. *See Brown v. United States*, No. 3:07-0621, 2008 U.S. Dist. LEXIS 52986, at *20 (M.D. Pa. July 7, 2008). "In most

circumstances, a plaintiff must prove causation by expert medical testimony." *Schweikert v. Eagle*, No. 20-4310, 2022 U.S. Dist. LEXIS 22947, at *7 (E.D. Pa. Feb. 9, 2022) (citing *Lattanze v. Silverstrini*, 448 A.2d 605, 608 (Pa. Super. Ct. 1982)).  The "mere occurrence of an injury does not prove negligence." *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978).  The fact that a plaintiff is particularly susceptible to injury does not limit a defendant's liability "because negligence causing aggravation of a pre-existing condition subjects a tortfeasor to the same degree of liability as the infliction of an original wound." *Brown*, 2008 U.S. Dist. LEXIS 52986, at *24-25 (citing *Fretts v. Pavetti,* 422 A.2d 881, 885 (Pa. Super. 1980)).

"To prove damages, a plaintiff must give a factfinder evidence from which damages may be calculated to a reasonable certainty." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225-26 (3d Cir. 2003) (internal quotations omitted).  Recoverable damages under Pennsylvania law may be economic (lost wages, loss of future earning capacity, and medical expenses) and non-economic (pain and suffering, past, present and future mental anguish, loss of enjoyment of life, and disfigurement). *See Durosky v. United States*, No. 07-1828, 2008 U.S. Dist. LEXIS 97383, at *17-18 (M.D. Pa. Dec. 1, 2008); *Davis v. United States*, No. 94-1457, 1995 U.S. Dist. LEXIS 6610, at *15-20 (E.D. Pa. May 15, 1995).  Past medical expenses must be reasonable and the services necessary and related to the injuries for which recovery was sought. *See Martin v. Soblotney*, 466 A.2d 1022, 1024 (Pa. 1983).  Future medical expenses must be reasonably likely to be incurred. *Reed v. Sossong*, No. 3:20-35, 2022 U.S. Dist. LEXIS 66064, at *7 (W.D. Pa. Apr. 8, 2022) (citing *Moorhead v. Crozer Chester Medical Center*, 765 A.2d 786, 789 (Pa. 2001)).

C.        MVRFL and Limited Tort – Review of Applicable Law

"The MVFRL [Motor Vehicle Financial Responsibility Law] allows Pennsylvania drivers to elect either a 'limited tort' or a 'full tort' option when purchasing their car insurance." *Stringfellow v. United States*, No. 18-733, 2020 U.S. Dist. LEXIS 101717, at *15 (W.D. Pa. June 10, 2020) (citing 75 Pa. C.S. § 1705). Under the limited tort option, the insured "may seek recovery for all medical and other out-of-pocket expenses, but not for pain and suffering or other nonmonetary damages unless the injuries suffered fall within the definition of 'serious injury' as set forth in the policy or unless one of several other exceptions noted in the policy applies." 75 Pa. C.S. § 1705(a)(1)(A). The expenses must have been actually paid or reasonably necessary to be incurred. *See Moorhead*, 765 A.2d at 789. Serious injury is defined as "personal injury resulting in death, serious impairment of body function or permanent serious disfigurement." 75 Pa. C.S. § 1702. Neither the statute nor the legislative history defines "serious impairment of a body function." *Furman v. Shapiro*, 721 A.2d 1125, 1126 (Pa. Super. Ct. 1998).

The courts have explained that the "inquiry is limited to: (a) what body function, if any, was impaired, because of the injuries sustained in the motor vehicle accident; and (b) was the impairment of the body function serious." *Id.*; *Sanderson-Cruz v. United States*, 88 F. Supp. 2d 388, 393-94 (E.D. Pa. 2000) (citing *Washington v. Baxter*, 719 A.2d 733, 740 (Pa. 1998)). "The focus is not on the injuries but on how the injuries affected a particular body function with medical testimony generally required to establish the existence, extent, and permanency of the impairment, although an impairment need not be permanent to be serious." *Sanderson-Cruz*, 88 F. Supp. 2d at 393-94 (citing *Washington*, 719 A.2d at 740). "Generally, medical testimony will be needed to establish the existence, extent, and permanency of the impairment." *Hellings v. Bowman*, 744 A.2d 274, 276 (Pa. Super. 1999). In "determining whether the impairment was

serious, several factors should be considered: the extent of the impairment, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. An impairment need not be permanent to be serious." *Furman*, 721 A.2d at 1126; *Cadena v. Latch*, 78 A.3d 636, 640 (Pa. Super. 2013) (quoting *Graham v. Campo*, 990 A.2d 9, 16 (Pa. Super. 2010), *appeal denied*, 16 A.3d 504 (Pa. 2011)). However, the plaintiff "must show that her injury 'resulted in such substantial interference with any bodily function as to permit a conclusion that the injur[y] ha[s] resulted in a serious impact on [her] life for an extended period of time.'" *Stringfellow*, 2020 U.S. Dist. LEXIS 101717, at *17 (quoting *McGee v. Muldowney*, 750 A.2d 912, 915 (Pa. Super. 2000)). "[S]ubjective allegations alone, in the absence of objective medical evidence, are not sufficient to establish that a serious injury has occurred." *Benton v. Shull*, 240 A.3d 904 (Pa. Super. Ct. 2020).

Limited tort is an affirmative defense. *Sanderson-Cruz*, 88 F. Supp. 2d at 392.

### D.     Application of Law to Facts

This is a negligence action brought against the United States pursuant to the FTCA. This Court has jurisdiction over the subject matter and the parties to this action pursuant to 28 U.S.C. § 1346(b)(1). The event at issue here, the collision on May 31, 2019, occurred in Allentown, Pennsylvania. Accordingly, venue is proper in this district, *see* 28 U.S.C. § 1391(b)(2), and the substantive law of Pennsylvania governs, *Barnes v. United States*, 685 F.2d 66, 68 (3d Cir. 1982) (determining that because the tort occurred in Pennsylvania, the district court was bound to apply Pennsylvania law).

Ms. Torres initially presented her administrative claim to the USPS seeking damages of $500,000 for personal injuries and $500 for property damage.  Ms. Torres's damages in the above-captioned action are therefore limited to $500,500.[9]

The parties stipulate to the first two elements of a negligence claim: duty and breach.  On May 31, 2019, Ms. Choi was delivering mail within the scope of her employment with the United States Postal Service, owed a duty of care to Ms. Torres, and breached that duty, negligently causing a collision.  The issues in this case are, first, whether Ms. Torres's injuries were the actual and proximate cause of the breach and, second, damages.

Ms. Torres did not establish by a preponderance of the evidence that she suffered a concussion or post-concussive syndrome as a result of the May 31, 2019 collision.  She did not lose consciousness in the collision, and there is no and/or insufficient evidence that she was temporarily dazed and confused immediately after the collision.  Additionally, there is no/insufficient evidence that she experienced any symptoms of a concussion until more than a week after the collision.  Although Ms. Torres has headaches and migraine-related symptoms, she did not establish by a preponderance of the evidence that any ongoing headaches or related symptoms or alleged cognitive deficits are causally related to (caused or exacerbated by) the collision.  Each of the symptoms Ms. Torres has suffered since the collision pre-existed the collision.  Although her migraines had improved in the months prior to the collision, her migraine condition is chronic and waxes and wanes in severity.  Independent factors explain the return of her migraines in the months/year after the collision, including her increased stress and pain related to her shoulder beginning on or about May 31, 2019, her discontinuance of migraine

---

[9]    The Opinion and Order dated June 13, 2022, limiting damages to $500,500 are specially incorporated herein.  *See* ECF Nos. 24-25 (explaining that Ms. Torres had not met either exception to the sum certain requirement).

injections by August 2019, and her transition to all online work and school in March of 2020 due to the coronavirus pandemic.  Consequently, Ms. Torres did not establish by a preponderance of the evidence that her visits to her neurologist and/or hospital and/or treatment in relation to her migraines and related symptoms were necessary or causally related to the collision on May 31, 2019.  She may not recover any damages related to these injuries.

Ms. Torres did not establish by a preponderance of the evidence that she suffered a brachial plexus injury, CRPS, or other identifiable nerve/structural damage.  Significantly, diagnostic studies, cervical x-rays, an MRI, and evaluations by two doctors in June 2019 of her right arm/shoulder, neck, and upper back revealed no structural damage and/or abnormalities.  There were consistent findings in/by subsequent medical records, physical examinations, and diagnostic studies between 2019 and 2022, specifically including the 2022 EMG.

Ms. Torres did, however, establish by a preponderance of the evidence that the collision on May 31, 2019, was the proximate cause of the sprain/strain injuries to her right-arm/shoulder, neck, and/or upper back.  She further established that the back pain, neck pain, and neck stiffness she experienced no less than five months prior to the collision was exacerbated by the collision. The supporting evidence includes medical records confirming Ms. Torres's complaints of pain to the responding officer and ambulance personnel on the day of the collision, her return visits to the hospital seeking treatment for these injuries on four more occasions in the first two and a half weeks after the collision, and records from approximately thirteen physical therapy sessions between June 28, 2019, and August 1, 2019, for her shoulder.  For the reasons discussed below, these injuries were not serious.  Although Ms. Torres may recover damages related to these injuries, damages are limited.

The United States established by a preponderance of the evidence that Ms. Torres had limited tort insurance coverage at the time of the collision.[10]  She is therefore barred from recovering for pain and suffering or other nonmonetary damages unless the injuries to her right arm/shoulder, neck, and upper back were "serious" under the MVFRL.  Ms. Torres did not establish by a preponderance of the evidence that her injuries resulting from the collision (right-arm/shoulder, neck, and/or upper back) were "serious."

As to the nature and extent of impairment, her injuries have not caused "substantial interference with any bodily function." *See McGee*, 750 A.2d at 915.  Immediately after the collision, Ms. Torres exited her vehicle without any assistance.  She is seen on the responding officer's body camera walking around after the collision, talking on her cellphone, using her right arm/hand to hold her phone, gesturing and moving both arms, stretching out her right arm and shaking hands, and holding her purse and a full water bottle with her right arm/hand.  Ms. Torres had no noticeable limitations at that time, nor at the time of trial.  Ms. Torres testified at trial that she continues to experience pain in her right arm and right shoulder, which impairs her ability to perform daily activities such as combing and blow-drying her hair, brushing her teeth, bathing, doing laundry, washing dishes, vacuuming, dusting, cooking, and carrying heavy items.  However, she also testified that cognitive issues (increased heart rate causing lightheadedness) interfere with her ability to do "any" physical activities, specifically including vacuuming and dusting.  Ms. Gerez, Ms. Moran, and Ms. Faust similarly blamed Ms. Torres's limitations since the collision on her cognitive issues and migraine-related symptoms.  Aside from a few months immediately after the collision, Ms. Torres has lived alone and has seen to her own household

---

[10]     The Order issued this day granting in part the Defendant's Motion to Supplement the Factual Record and admitting the signed election page as Trial Exhibit J76 is specifically incorporated herein.

chores and personal care.  Her shoulder/neck/back injury causes pain, but does not prevent her

from looking after herself normally, from driving, or from completing her "usual work."  *See*

*Clemens v. Granda*, 36 Pa. D. & C.4th 312, 321 (C.P. 1998) (concluding that because the

evidence showed the "plaintiff is capable of, and is, in fact, living her life, enjoying all of the

body functions necessary [], as she did prior to this incident, except experiencing some pain in so

doing," her injury was not "serious"); *Flowers v. Smith*, 33 Pa. D. & C.4th 298, 303-04 (C.P.

1996) (concluding that the plaintiff did not suffer serious injury despite having pain four years

later that sometimes prevented her from making her bed, vacuuming, and bowling).  Ms. Torres

was medically cleared to, and did, return to work less than three and a half months after the

collision.  *See Sanderson-Cruz v.* 88 F. Supp. 2d 388 (concluding that the plaintiff's soft tissue

injury causing pain in her right shoulder, neck and low back she suffered in the motor vehicle

accident was not "serious" under the MVFRL but did, for more than two and a half months,

require medical treatment and contribute to her inability to return to work).  When Ms. Torres

returned to work in September 2019, she also continued her education at Muhlenberg College as

an A-student until her graduation in December 2020.  Since returning to work and through the

time of trial, she has continuously worked full-time.  *See Flowers*, 33 Pa. D. & C.4th at 303-04

(finding no serious impairment of a bodily function where the plaintiff was precluded from

working for less than six months and worked full-time after returning).  At no point after the

collision did Ms. Torres seek disability accommodations with any of her employers.  Rather, she

moved along quickly in her career path.

The limited length of time the impairment lasted and the non-extensive treatment

required to correct the impairment further supports the conclusion that the injuries have not

"resulted in a serious impact on [Ms. Torres's] life for an extended period of time."  *See McGee*,

750 A.2d at 915.  Ms. Torres had physical therapy and/or received chiropractic treatment for these injuries between June 24, 2019, and July 31, 2019.  More than a year passed[11] without treatment to Ms. Torres's right-arm/shoulder, neck, and/or back, then between November 2020 and February 2021, her pain was treated with acupuncture, heat, and massage approximately three times each month.  She continued receiving acupuncture approximately three times a month through October 2, 2021.  *See Dodson v. Elvey*, 665 A.2d 1223, 1228-235 (Pa. Super. 1995) (concluding that the plaintiff's injury (rotator cuff damage, fractured elbow, and cervical/lumbar sprain) was not "serious" even though the soft tissue injury would be symptomatic periodically for two to three years before resolving and the plaintiff could not use his arm for several weeks, received heat and physical therapy three months after the accident, was out of work for four months, would suffer long-term weakness, was unable to engage in recreational activities like before the accident, and no longer used his left arm to carry his son).[12] All such treatment was based largely on her subjective complaints of pain.  Also, as previously mentioned, Ms. Torres also received chiropractic care and experienced back pain, neck pain, and neck stiffness prior to the collision.  Diagnostic tests, including multiple MRIs, an MRA, an EMG, and x-rays, conducted in June 2019, April 2020, November 2020, and February 2022 all showed no damage or abnormalities to Ms. Torres's right-arm/shoulder, neck, and/or back.  At no time did Ms. Torres require surgery or other invasive treatment, and no further treatment is

---

[11]     During this time, Ms. Torres was treated for her pre-existing migraines and related cognitive issues.

[12]     Although *Dodson* was subsequently reversed and remanded by the Pennsylvania Supreme Court, it was only because the issue of serious injury had been decided on summary judgment, which after viewing the facts in the light most favorable to the plaintiff was "appropriate only in the clearest of cases."  *See Dodson v. Elvey*, 720 A.2d 1050 (Pa. 1998); *Washington*, 719 A.2d at 738.  Comparatively here, this Court's conclusion that Ms. Torres's injury was not serious is made as fact-finder following a non-jury trial at which she carried the burden of proof.

recommended.  *See Flowers*, 33 Pa. D. & C.4th at 303-04 (concluding that the plaintiff's injuries

to her sciatic nerve, back, and neck were not serious considering that her pain was less intense

four years later than immediately after the accident and was treated primarily with physical

therapy for eleven months).

Under the facts of this case, which also includes the pain caused by Ms. Torres's chronic

migraine condition and her inconsistent statements regarding symptoms, and in the absence of

any objective medical evidence showing the extent of her injury, Ms. Torres did not establish by

a preponderance of the evidence that any injury to her right-arm/shoulder, neck, and/or upper

back suffered in the collision caused "substantial interference with any bodily function."  *See*

*Benton*, 240 A.3d 904 (concluding that the plaintiff "did not establish that he suffered a 'serious

injury' when he did not provide any objective medical evidence regarding the degree of an

impairment and the extent of any pain suffered").

Because Ms. Torres did not suffer serious bodily injury, her damages are limited to

medical and other out-of-pocket expenses, including property loss and lost wages.  Ms. Torres is

entitled to recover the amounts paid for medical treatment she received for any arm/neck/back

injuries during the fourteen-week period of time between the afternoon of May 31, 2019, through

September 10, 2019, when she was medically cleared to return to work.  For this time period,

Ms. Torres presented no evidence of any medical bills paid and does not seek reimbursement for

any medical costs.  Next, because Ms. Torres continued to experience pain in her

shoulder/neck/back through 2022, this Court finds the treatment related thereto was reasonably

necessary so that she may recover these expenses.  She is entitled to damages for the cost of heat,

massage, and acupuncture treatment between November 18, 2020, and October 2, 2021, in the

total amount of $1,977.50.[13]  She is also entitled to damages for medical costs related to

evaluation/treatment for her shoulder on January 28, 2022, and on February 7, 9, 10, and 28,

2022, in the total amount of $477.89.  All other medical care was provided for Ms. Torres's pre-

existing conditions.  She is thus not entitled to recover from the United States for any other past

medical expenses.  Ms. Torres did not establish by a preponderance of the evidence that she

needs future medical treatment for these injuries, as there is no such recommendation by any

treating physician or in Dr. Harris's expert opinion.  Consequently, Ms. Torres did not establish

that any future medical expenses are reasonably necessary to be incurred.  She is not entitled to

recover for any future medical expenses.

 The United States is therefore liable to Ms. Torres for $2,455.39 in medical costs; $500 in

compensation for property damage; and $8,884.68 in lost wages.  All such damages accrued as a

result of the injuries she sustained in the collision on May 31, 2019, with postal service carrier

Choi's vehicle.  This award fairly and adequately compensates Ms. Torres for all available

damages.  A judgment in the total amount of $11,840.07 is entered in favor of Ms. Torres and

against the United States.

### D. FINAL/SUMMARY CONCLUSIONS OF LAW

 Ms. Choi was an employee of the United States Postal Service on May 31, 2019.  She

owed a duty of care to Ms. Torres.  Acting within the scope of her employment, Ms. Choi and by

extension the United States breached that duty of care on May 31, 2021, by negligently causing a

motor vehicle collision with Ms. Torres.  The collision totaled Ms. Torres's vehicle.  Ms. Torres

was injured in the collision and was out of work until September 10, 2019.  Ms. Torres failed to

---

[13] This amount arises from treatment at Lehigh Valley Oriental Med Centre in the amount
of $1,237.50 and payment of $740.00 to Kim's Acupuncture.

prove by a preponderance of the evidence that her migraines and related cognitive symptoms were causally related to the collision. She did establish by a preponderance of the evidence that the collision was the proximate cause of the injuries to her right-arm/shoulder, neck, and/or upper back. Because these injuries were not "serious" under the MVFRL and Ms. Torres had only limited tort insurance coverage on May 31, 2019, her damages are limited to the following: (1) $2,455.39 in medical costs; (2) $500 for property damage; and (3) $8,884.68 in lost wages. A judgment in the total amount of $11,840.07 is entered in favor of Ms. Torres and against the United States.

A separate Order will be issued.

BY THE COURT:

_/s/ Joseph F. Leeson, Jr._____
JOSEPH F. LEESON, JR.
United States District Judge